✓ Priority
✓ Send
__ Clsd
∕ Enter
⌐⌐ JS-5/JS-6
__ JS-2/JS-3

**FILED**

MAY – 2 2000

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| | Case No. CV 99-3010 -GAF (Ex) |
| Michele LeBlanc, | |
| Plaintiff, | **ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| William D. Moses; Gary Horowitz; John Wheeler; Mel Lawrence; The Recovery Network, Inc.; and Does 1-10, inclusive, | |
| Defendants. | |

ENTERED
CLERK, U.S. DISTRICT COURT

MAY 3 – 2000

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

### I.

### INTRODUCTION

This case arises out of the employment relationship between Plaintiff Michele LeBlanc, and Defendants The Recovery Network, Inc. ("RNET") and its employees William Moses ("Moses"), Gary Horowitz ("Horowitz"), John Wheeler ("Wheeler"), and Mel Lawrence ("Lawrence"). Plaintiff was employed at RNET as in-house counsel from December 1997 until RNET decided to out source its legal work in August 1998. When the legal department was disbanded, plaintiff's employment was terminated. Plaintiff has brought a number of claims arising out

✓ Docketed
__ Copies / NTC Sent
__ JS - 5 / JS - 6
__ JS - 2 / JS - 3
__ CLSD

MAY 0 3 2000

1

64.

1   of her termination; defendants have moved for summary judgment as to each of

2   those claims.

3         The motion for summary judgment came on for hearing on March 20, 2000.

4   The Court has now read and considered the moving, opposition and reply papers

5   filed in connection with the motion, the supplemental papers filed in response to

6   the Court's interim order regarding the motion, the authorities cited in those

7   papers and the argument of counsel at the hearing.  For the reasons set forth

8   below, the Court GRANTS the motion in part and DENIES the motion in part as

9   follows:

| Claim for Relief | Defendant(s) | Cause of Action | Ruling |
|---|---|---|---|
| First | RNET | Unpaid Wages; Calif. Labor Code §201 et seq. | DENIED |
| Second | RNET | Breach of Contract | DENIED |
| Third | RNET | Fraud | GRANTED |
| Fourth | RNET, Moses | Securities Fraud | GRANTED |
| Fifth | RNET | Gender and Wage Discrimination | GRANTED |
| Sixth | RNET | Religious Discrimination | GRANTED |
| Seventh | All Defendants | Sexual Harassment | GRANTED as to individual defendants; DENIED as to RNET |
| Seventh | All Defendants | Religious Harassment | GRANTED |
| Eight | All Defendants | Retaliation | GRANTED |
| Nine | RNET | Wrongful Termination | GRANTED |

| Ten | All Defendants | Intentional Infliction of Emotional Distress | DENIED |

## II.

## FACTUAL BACKGROUND[1]

**A.**    **Plaintiff Joins the Recovery Network in December of 1997 as Vice President of Business & Legal Affairs**

Plaintiff was hired as RNET's Vice President of Business & Legal Affairs on December 1, 1997. (UF 1.) The terms and conditions of plaintiff's employment set forth in a letter agreement. (Declaration of Tracy Neal dated January 14, 2000 ("Neal Dec."), Exh. A.) Pursuant to the term sheet attached to letter agreement, the contract was for one year with automatic renewal unless terminated. (Id.) Plaintiff could be terminated "for good cause, upon at least 30 days advance written notice, with compensation as calculated through the date of termination." (Id.) Good cause was defined "solely as gross negligence or willful misconduct, or given the nature of the Company's mission, alcohol or substance abuse." (Id.) Plaintiff could also be terminated "without good cause, upon 30 days advance written notice, with severance compensation equal to 3 months base salary at the

---

[1]The Court notes that, despite the abundance of material submitted by the parties, much of it is inadmissible. Declarations that are conclusory or that do not lay a foundation that would make the declarant competent to testify do not provide a basis on which to grant or deny summary judgment. F.R.C.P. 56(e); Bank Melli v. Pahlavi, 58 F.3d 1406, 1412 (9th Cir.), cert. denied 516 U.S. 989 (1995) (declaration not based on personal knowledge entitled to no weight).

In addition, both parties have submitted documents without first making the appropriate foundation with which to authentic them or to introduce them as business records. Objections to the introduction of such documents are sustained. However, where no objection is made, the Court will accept the documents. See Faulkner v. Fed'n of Preschool and Comm. Educ. Ctrs., Inc., 564 F.2d 327, 328 (9th Cir. 1979) (per curium) ("documents not in compliance with Rule 56(e) may nonetheless be considered . . . in the absence of an objection by counsel").

1   time of such termination, to be paid half upon the termination date and the other

2   half divided evenly over the subsequent three months." (Id.)

3       Plaintiff reported to the CFO and General Counsel, Greg Richey. (Neal Dec.,

4   Exh. A.) Her salary was set at $85,000 from December 1, 1997 until March 1, 1998

5   at which time the salary was to increase to $120,000. (Id.) Plaintiff's

6   compensation also included options to purchase 7,500 shares of RNET common

7   stock pursuant to the 1998 Stock Plan, subject to approval by the RNET Board of

8   Directors and the RNET shareholders. (Id.) Finally, RNET paid moving expenses

9   and costs associated with plaintiff's joining the California bar. (Id.)

10   **B.   The July 1, 1998 Letter Agreement**

11       About six weeks before her termination, Plaintiff and RNET entered into a

12   second letter agreement defining the terms of her employment at RNET. The

13   terms of the second letter agreement were substantially similar to the first with

14   the exception of the provisions regarding salary, options, and early termination.

15   (Neal Dec., Exh. D.)

16       The July 1, 1998 letter agreement raised plaintiff's salary to $120,000 per

17   year, but provided that her "salary and benefits at all times shall be

18   commensurate with the highest salary paid to any other Employee with a title of

19   the same level within the Company hierarchy." (Id.) The options term noted that

20   the 1998 Stock Option Plan had been approved by the Board of Directors and the

21   shareholders, and indicated that Plaintiff "shall receive options to purchase 7,500

22   shares of the Company's common stock at a price of $3.15, or lower if said

23   options are re-priced, pursuant to the 1998 Stock Plan. (Id.) Additional options

24   shall be granted to Employee commensurate with her position, on a 'most favored

25   nations' basis with other Employees with a title of the same level within the

26   Company hierarchy." (Id.) Finally, the new contract provided that the company

27   could terminate the contract "for good cause, upon at least 90 days written notice,

28   with compensation, including unused sick and vacation days, as calculated

4

1   through the date of such termination" and that the company could terminate the

2   contract "without good cause, upon 30 days advance written notice, with

3   severance compensation equal to three months base salary at the time of such

4   termination, to be paid half on the termination date and the other half divided

5   evenly over the subsequent three months." (Id.)(emphasis added)  The definition

6   of good cause remained the same.  (Id.)

7   **C.    <u>Registration Of Plaintiff's Options</u>**

8           As noted above, both letter agreements between Plaintiff and RNET contain

9   a mention of a grant of 7,500 options.[2]  Neither letter agreement mentions

10  whether the options will be registered or unregistered.[3]

11          During a July 22, 1998 meeting of the Board of Directors, attended by

12  LeBlanc who recorded the proceedings, RNET promised to register plaintiff's

13  options pursuant to an SB2 filing with the Securities and Exchange Commission.

14  (LeBlanc Dec., Exh. 32.)  The minutes of the meeting indicate that an SB2 filing

15  was "approved at the last Board meeting to register options for all Board

16  members and several key employees, including Gregory Richey, John Wheeler,

17  and Michele LeBlanc."  (Id.)  It is undisputed that the shares underlying plaintiff's

18  agreement were never registered with the SEC.  (UF 6.)

19  _____

20  [2]Plaintiff contends that she was entitled to 7,500 options pursuant to *each* agreement for a
    total of 15,000 options under the two agreements.  Defendants contend that each agreement

21  granted the same 7,500 options.  For the reasons discussed below, this dispute cannot and
    need not be resolved here.  In addition, although the issue is not raised in defendant's

22  Statement of Uncontroverted Facts or Plaintiff's Statement of Genuine Issues of Material
    Fact, Plaintiff contends she was granted options on an additional 100,000 shares.

23  Specifically, she asserts that, on January 9, 1998, RNET granted her options on an additional
    "50,000 shares priced and repriced as the other options" and again in June 1998, granted her

24  options on "another 50,000 shares priced and repriced as the other options."  (Declaration
    of Michele LeBlanc dated January 21, 2000 ("LeBlanc Dec."), ¶ 7.)  Whether or not Plaintiff

25  received these additional grants is an issue that is not properly before the Court in
    connection with the present motion.

26

27  [3]RNET has attempted to introduce evidence of an Option Agreement specific to Plaintiff
    which demonstrates that the option grant to Plaintiff would consist of unregistered options.

28  However, this document has not been properly authenticated and will not be considered by
    the Court over plaintiff's objection.  See Fed. R. Evid. 56(e).

**D.   RNET Terminates Plaintiff On August 21, 1998**

      **1.   Gary Horowitz Becomes President of RNET**

On or about July 20, 1998, Gary Horowitz was hired president of RNET. (UF 10.) Horowitz joined RNET with a mandate to streamline its operations and reduce its operating expenses. (UF 11-13.) Upon joining RNET, Horowitz determined that he could save money by eliminating RNET's legal department and outsourcing all legal work to Greenberg, Glusker, Fields, Claman & Machtinger LLP ("Greenberg Glusker"). (UF 14, Declaration of Gary Horowitz dated January 14, 2000 ("Horowitz Dec."), ¶¶ 6-7.)   At that time, there were three attorneys in the legal department: Greg Richey, Plaintiff, and Tracy Neal. (LeBlanc Dec., ¶ 26, Supplemental Declaration of Michele LeBlanc dated February 26, 2000 ("LeBlanc Supp. Dec."), ¶8j.)

      **2.   Horowitz and Plaintiff Discuss Outsourcing**

On August 19 or 20, 1998, Horowitz met with plaintiff to tell her that he was eliminating the legal department and outsourcing the legal work to Greenberg, Glusker. (LeBlanc Dec, ¶ 21, LeBlanc Supp. Dec., ¶ 29,  Horowitz Dec., ¶ 9.) At that time, Horowitz indicated that plaintiff would be retained for three months as a liaison between RNET and Greenberg Glusker. (LeBlanc Dec., ¶ 22, LeBlanc Supp. Dec., ¶ 29.)

      **3.   Horowitz Terminates Plaintiff**

On August 20, 1998, Horowitz sent plaintiff a letter on August 20, 1998 stating that plaintiff's employment with RNET would end the following day, Friday, August 21, 1998. (UF 17, LeBlanc Dec., Exh. 30.)  RNET instead retained Tracy Neal to act the liaison between RNET and Greenberg Glusker because (1) Neal was a licensed attorney in California and (2) Neal's compensation was much lower than plaintiff's. (Horowitz Dec., ¶ 8.)

On September 22, 1998, RNET sent plaintiff two checks: (1) $5,314.71 as payment for her earned, unpaid salary including vacation time and (2) $30,000 as

6

1  payment in lieu of 30 days notice of termination ($10,000) and the first two

2  installments of severance compensation ($20,000) as provided by her contract

3  under the early termination without good cause provision. (LeBlanc Dec.,

4  Exh. 15; Neal Dec., Exh. D.)

5  **E.   Plaintiff Attempts Unsuccessfully to Exercise Her Options**

6  Following her termination, Plaintiff presented herself at RNET's

7  headquarters and attempted to exercise options on 115,000 shares of RNET stock.

8  (See UF 19.)  Both Neal and Horowitz refused to accept payment for any options,

9  and directed plaintiff to contact RNET's New York transfer agent. (UF 20, LeBlanc

10  Dec., ¶ 42.)  RNET then directed plaintiff to attempt to exercise her options

11  through her broker. (LeBlanc Dec., ¶ 44.)

12  **III.**

13  **LEGAL ANALYSIS**

14  **A.   Standard for Summary Judgment**

15  The Court must deny summary judgment if there are "any genuine factual

16  issues that properly can be resolved only by a finder of fact because they may

17  reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc.,

18  477 U.S. 242, 250 (1986).  When the moving party properly makes and supports a

19  motion for summary judgment, the opposing party may not rest upon mere

20  denials to create a triable issue, but "must set forth specific facts showing that

21  there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(emphasis added).  Such

22  evidence must be presented in the Statement of Genuine Issues and must be

23  supported by evidence that would be admissible at trial. Local Rule 7.14.3.  The

24  Court has no obligation to search through the record to find evidence not

25  identified in the Statement of Genuine Issues. Nilsson, Robbins, Dalgarn, Berliner,

26  Carson & Wurst v. Louisiana Hydrolic, 854 F.2d 1538, 1545 (9th Cir. 1988)(per

27  curium) (Local Rule 7.14.3 serves as "adequate notice to nonmoving parties that if

28  a genuine issue exists for trial, they must identify that issue and support it with

7

1   evidentiary materials, without the assistance of the district judge"). The evidence

2   presented is viewed in the light most favorable to the non-moving party. <u>Harris v.</u>

3   <u>Itzhaki</u>, 183 F.3d 1043, 1050-51 (9th Cir. 1999).

4         An issue is genuine if there is evidence produced that would allow a

5   reasonably jury to reach a verdict in favor of the non-moving party. <u>Anderson</u>,

6   477 U.S. at 248.  A "scintilla of evidence," or evidence that is "merely colorable" or

7   "not significantly probative," is not sufficient to present a genuine issue as to a

8   material fact. <u>United Steelworkers of America v. Phelps Dodge Corp.</u>, 865 F.2d

9   1539, 1542 (9th Cir.), <u>cert. denied</u> 493 U.S. 809 (1989)  (quoting <u>Anderson</u>, 477 U.S.

10  at 249-50, 252).

11        Where the motion for summary judgment is presented by a defendant, the

12  defendant need not negate the plaintiff's entire case. <u>Celotex v. Catrett</u>, 477 U.S.

13  317 (1986).  "The plain language of Rule 56(c) mandates the entry of summary

14  judgment, after adequate time for discovery and upon motion, against a party

15  who fails to make a showing sufficient to establish the existence of an element

16  essential to that party's case, and on which that party will bear the burden of proof

17  at trial." <u>Id.</u> at 332.  Thus, if the non-moving party bears the burden of proof at

18  trial, the moving party may carry its burden by showing an absence of evidence

19  to support an element of the non-moving party's case. <u>Id.</u>

20  **B.     <u>Wages Against RNET (First Cause of Action)</u>**

21        Under California law, when an employer terminates its employee, it must

22  pay the employee all wages earned and unpaid "immediately." <u>Cal. Labor Code</u>

23  § 201.  If the employer fails to do so, it may be penalized in the amount equal to

24  the terminated employee's salary accrued from the date of termination through

25  the date of payment (up to thirty days). <u>Cal. Labor Code</u> § 203.  However, an

26  employee who wilfully avoids his or her employer's attempts at payment will not

27  be entitled to any penalties. <u>Id.</u>

28

8

1   Plaintiff was not paid for her earned time or vacation until one month after

2   her termination.  Somewhat belatedly, RNET asserts in its reply that plaintiff

3   willfully avoided its attempt to pay her.  However, there is no such evidence in

4   RNET's Statement of Undisputed Facts.[4]  Even if the evidence was considered,

5   RNET has shown nothing more than that there is a triable issue of fact whether

6   plaintiff avoided payment.  Accordingly, with respect to plaintiff's First Cause of

7   Action for Wages, defendants' motion for summary is DENIED.

8   **C.**   **Breach of Contract Against RNET (Second Cause of Action)**

9   Plaintiff alleged that RNET breached her employment contract by: (1) failing

10   to pay her the same as other Vice Presidents; (2) failing to provide her with proper

11   advance notice of her termination; (3) failing to provide her with all severance

12   owed; and (4) failing to allow her to exercise her stock options.  (First Amended

13   Complaint ("FAC"), ¶¶ 30-34.)

14   **1.**   **There is a Triable Issue as to Whether Plaintiff was Underpaid**

15   RNET has not introduced any admissible evidence that plaintiff was paid

16   the same salary as other Vice Presidents.  Although it tenders the declaration of

17   Tracy Neal, that declaration lays no foundation for Neal's testimony regarding the

18   salary of the Vice Presidents.  On the other hand, plaintiff submitted evidence,

19   such as SEC documents, that indicates that others were paid more than she.

20   (See, e.g., LeBlanc Dec., Exh. 34.)  Accordingly, there are triable issues of fact as

21   to whether plaintiff was underpaid under the terms of her contract.[5]

22

23

24   [4]Even if the Court looked to the evidence submitted in reply, the evidence is inadmissible.
RNET has offered evidence that it was prepared to give plaintiff a check for $25,000 on
25   August 21, 1998 through the declaration of Tracy Neal.  (Supplemental Declaration of Tracy
Neal dated January 31, 2000, ¶ 2).  However, Neal lays no foundation for this testimony.  In
26   any event, that amount would be deficient.  At the time of her termination, plaintiff was
entitled to at least $35,000.  See LeBlanc Dec., Exh. 15.

27   [5]There is a further dispute about whether Mr. Lawrence was an employee or an independent
28   contractor.  If he was an employee, he was a "Vice President."  Thus, there is also a triable
issue of fact regarding his status.

2.   **RNET did not Breach Plaintiff's Contract by Failing to Provide Proper Advance Notice of Her Termination**

Although plaintiff's contract entitles her to 30 days notice prior termination[6] (Neal Dec., Exh. D), it is undisputed that RNET paid plaintiff her monthly salary in lieu of such notice. (LeBlanc Dec., Exh. 15.)  Plaintiff contends that this denied her the opportunity to seek employment while still holding a position with RNET, thus rendering her job search more difficult.  RNET contends that, while it did not give her 30 days notice, Plaintiff has no damages because it paid her an additional 30 days salary.  In essence, RNET argues that she has no damages as a result of the breach or that any alleged damages are too speculative to be recovered.

In an action for breach of contract, a party may only recover for damages that are foreseeable.  See Cal. Civ. Code § 3300.  When parties agree that a contract may be terminated for any reason (or no reason) upon giving a specified notice, damages are limited to the notice period.  Martin v. U-Haul Co., 204 Cal. App. 3d 396, 409 (1988).  Thus, "'if the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given.'"  Id. at 408 (quoting Bitterman v. Gluck 256 A.D. 336, 9 N.Y.S.2d 1007, 1008 (1939));  see also Pecarovich v. Becker, 113 Cal. App. 2d 309, 317 (1952)("[I]f a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach.")  Here, plaintiff seeks damages beyond the compensation which she would have earned during the notice period based on

---

[6]In their moving papers, defendants assert that plaintiff's termination was "with cause." This assertion is contradicted by the evidence.  One month after plaintiff's termination, defendants sent plaintiff a letter paying her $10,000 "in lieu of 30-days advance notice." (LeBlanc Dec., Exh. 15.) "With cause" terminations required 90 days advance notice. (Neal Dec., Exh. D.) Thus, it is clear that when RNET terminated plaintiff, it was "without cause."

1   her conclusory argument that looking of a job while one is employed is easier
2   than being able to devote one's entire energy to the job search.  Plaintiff submits
3   no evidence that she incurred more damages than is generally contemplated in
4   the law, or that RNET would have foreseen such damages.  Without such
5   evidence, plaintiff fails to present a genuine issue of material fact.  Accordingly,
6   RNET is entitled to summary judgment on this sub-issue.

7       **3.    There is a Triable Issue of Fact as to Whether Defendants Failed to**
8           **Permit Plaintiff to Exercise Her Options**

9       There is no question that Plaintiff attempted to exercise options on 115,000
10  shares of RNET stock and that RNET denied plaintiff's attempt to exercise those
11  options.  (UF 20.)  While RNET claims that plaintiff's manner of exercising was
12  improper, plaintiff asserts that RNET acted in bad faith.  Because an employer's
13  failure to allow an employee to exercise her options may be a breach of contract,
14  see  Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2nd Cir. 1971), a
15  triable issue remains on that issue and on the question of the number of options
16  actually granted Plaintiff.

17      Accordingly, defendants' motion for summary judgment on plaintiff's
18  Second Cause of Action for Breach of Contract is DENIED except insofar as
19  plaintiff claims damages for breach by RNET's failure to give proper advance
20  notice of her termination.

21  **D.    Fraud Against RNET (Third Cause of Action)**
22      Plaintiff's Third Cause of Action alleges common law fraud with respect to
23  her purchase and sale of securities.  (FAC, ¶¶ 37-51.)  For the reasons discussed in
24  Section III.D, infra (Fourth Cause of Action for Securities Fraud), RNET's motion
25  for summary judgment is GRANTED.

26  **E.    Securities Fraud Against RNET and Moses (Fourth Cause of Action)**[7]

27  _____

28  [7]Plaintiff initially included within her securities fraud cause of action a claim for violation of
    (continued...)

1    **1.    Dismissal Under Fed. R. Civ. P. 9(b) and 12(c)**

2          In their moving papers, defendants sought summary judgment on plaintiff's

3    securities fraud claim arguing that plaintiff had failed to satisfy Federal Rule of

4    Civil Procedure 9(b). After reviewing the First Amended Complaint, the Court

5    concluded that there might be merit in defendants' position, and ordered plaintiff

6    to show cause why the Court should not grant judgment in defendants' favor for

7    failing to comply with Rule 9(b).

8          Federal Rule of Civil Procedure 9(b) states that "[i]n all averments of fraud

9    or mistake, the circumstances constituting the fraud or mistake shall be stated

10   with particularity." Rule 9(b) applies to securities fraud. In Re Glenfed Inc. Secs.

11   Litig., 42 F.3d 1541, 1547-48 (9th Cir. 1994). Plaintiff's complaint is woefully

12   deficient. Plaintiff fails to state what false statements were made, who made

13   them, what about them was false, or that she justifiably relied on the false

14   statements in the purchase or sale of a security. See Gray v. First Winthrop Cor.,

15   82 F.3d 877, 884 (9th Cir. 1996).

16         Given plaintiff's pleading deficiencies, the Court could grant defendants

17   judgment on the pleadings. See, e.g., California ex rel. Mueller v. Walgreen Corp.,

18   175 F.R.D. 631 (N.D. Cal. 1997). On the other hand, the purpose of Rule 9(b) is to

19   put defendants on notice of what they are alleged to have done wrong and to

20   permit them to "'defend against the charge and not just deny that they have done

21   anything wrong.'" Id. (quoting Semegen v. Weidner, 780 F.2d 727, 730 (9th Cir.

22   1985)). Because the rule is designed to give defendants notice of their alleged

23   misdeeds, authority holds that failing to raise an objection prior to responding to

24

25

26   [7](...continued)

27   15 U.S.C. § 77q. However, plaintiff appears to have abandoned that claim in light of In re
     Washington Pub. Power Supply Sys. Securities Litig., 823 F.2d 1349 (9th Cir. 1987)(finding no

28   private right of action under 15 U.S.C. § 77q ). Accordingly, with respect to the claims under
     15 U.S.C. § 77q, the Motion for Summary Judgment is GRANTED.

1   the pleading waives the objection.  See Wright & Miller, Federal Practice and

2   Procedure, Civil 2d § 1394 n.7 (2d ed. 1990).

3        Here, the Court notes that the initial Complaint (including the securities

4   fraud allegations) was filed on March 23, 1999 and answered by all defendants on

5   April 19, 1999.  The parties conducted discovery, and defendants did not file the

6   instant motion until less than one month before the discovery cutoff.  Defendants'

7   delay in bringing their motion pursuant to Rule 9(b) indicates that they understood

8   the claims against them and defended themselves accordingly.  To grant

9   defendants' motion now would serve no purpose other than to delay the ultimate

10   resolution of this dispute.  See Walgreen, 175 F.R.D. at 637 (permitting plaintiff to

11   replead cause of action dismissed for failing to comply with Fed. R. Civ. P. 9(b)).

12        Accordingly, defendants' motion for judgment on the pleadings based on

13   plaintiff's failure to plead securities fraud with specificity pursuant to Federal Rule

14   of Civil Procedure 9(b) is DENIED.

15        **2.   Defendants' Motion for Summary Judgment**

16        In order to sustain a securities fraud claim pursuant to 15 U.S.C. § 78(j)(b)

17   ("§ 10(b)"), plaintiff must prove: "(1) a misrepresentation or omission (2) of

18   material fact (3) made with scienter (4) on which plaintiff justifiably relied (5) that

19   proximately caused the alleged loss."  Binder v. Gillespie, 184 F.3d 1059, 1063  (9th

20   Cir.), cert denied sub nom Binder v. Wilson, ___ U.S. ___, 120 S.Ct. 1158 (2000).  A

21   cause of action under § 10(b) must be with respect to a misrepresentation made

22   in connection with the purchase or sale of a security.  Id. at 1066.

23        **a.   Plaintiff Purchased Securities**

24        Contracts to purchase securities, even if only granting a contingent right to

25   purchase, are "purchases" for purposes of the 10(b).  Griggs v. Pace Am. Group,

26   Inc., 170 F. 3d 877, 880 (9th Cir. 1999); 15 U.S.C. § 78(c)(13)(defining "purchase" to

27   include any contract to acquire securities).  Importantly, the option agreement

28   must be a contract--i.e. bargained-for and exchanged for consideration.  Thus, for

13

1    example, when an employee commits to working for her employer in exchange

2    for stock options, the employee is a "purchaser." Yoder v. Orthomolecular

3    Nutrition Institute, Inc., 751 F.2d 555, 560 (2nd Cir. 1985). On the other hand, if the

4    employee is simply given stock options without changing her employment status,

5    there is no "purchase." In Re Cendant Corp. Securities Litig., 81 F. Supp.2d 550,

6    556 (D.N.J. 2000)(when only consideration for stock is continuation of

7    employment, there is no purchase or sale of securities); Childers v. Northwest

8    Airlines, Inc., 688 F. Supp. 1357, 1363 (D. Minn. 1988)(no purchase of securities

9    when option plan is incident to employment and employee's only choice is to

10   accept or forgo benefit entirely).

11        Here, plaintiff was given options on December 1, 1997 when she agreed to

12   work for RNET (UF 3),[8] and again on January 9, 1998, in consideration of taking on

13   extra duties. (LeBlanc Supp. Dec., ¶ 8f.)[9] At each of these times, the parties

14   entered into a contract. Plaintiff promised to work or to increase her

15   responsibilities in exchange for options. Thus, each agreement constituted a

16   "purchase." Yoder, 751 F.2d at 560.

17        **b.    There is No Evidence of Fraud In Connection With Purchase or Sale**

18        Upon reviewing the record on defendants' motion for summary judgment,

19   the Court could find no evidence that RNET made any intentionally false or

20   misleading statement that plaintiff justifiably relied upon in purchasing or selling

21   securities. However, rather than granting summary judgment immediately, the

22   Court ordered plaintiff to show specific evidence that RNET and Moses intended

23   to defraud her at the time she purchased the securities. Plaintiff responded by

24

---

25   [8]There is also a dispute as to whether plaintiff was given another set of options when she
26   renewed her contract on July 1, 1998. See n. 2, supra.

27   [9]In July 1998, plaintiff received another 50,000 options. (LeBlanc Dec. ¶ 7.) Because there
     is no evidence that she gave anything of value for these options, the are not "purchases"
28   under 10(b). See In Re Cendant Corp. Sec. Litig., 81 F. Supp at 556; Childers, 688 F. Supp.
     at 1363.

1  discussing five situations in which defendants allegedly intended to defraud her:

2  (1) failing to register her options; (2) misstating RNET's financial condition;

3  (3) misrepresenting that RNET had enough capital to operate successfully for the

4  term of plaintiff's agreement; (4) scheming to manipulate the market; and

5  (5) failing to allow plaintiff to exercise her vested options.

6          **(1)    Registration of Shares Underlying the Options**

7          As evidence that defendants defrauded her, plaintiff points to the minutes

8  from the July 22, 1998 Board meeting wherein RNET referenced a decision to

9  register the options. (OSC Resp., p. 16, LeBlanc Dec, Exh. 32.)  Plaintiff's options

10 were not registered. (UF 6.) Ergo, argues plaintiff, RNET intended to defraud her.

11         There are two flaw in this argument.  To show securities fraud, plaintiff

12 must prove more than that defendants failed to fulfill their promise.  She must

13 have evidence that the promise *was false when made, that is that it was made*

14 *with no intent to perform*. In Re Glenfed Secs. Litig., 42 F.3d 1541, 1547-48 (9th

15 Cir. 1994).  Plaintiff fails to submit any facts that, at the time defendants told her

16 they would register the stocks, defendants had no intention of doing so.  Thus,

17 this "misstatement" cannot be a basis for securities fraud.

18         Moreover, to be actionable, the misstatement must be in connection with

19 the purchase or sale--i.e., it must be made *before* the purchase or sale occurs.

20 Binder, 184 F.3d at 1066-67 (evidence must show that statement occurred before

21 purchase of securities).  Here, plaintiff "purchased" at least some of the options

22 *before* this Board meeting.  Thus, any promises at the meeting would not be in

23 connection with those purchases or sales of a security.

24         **(2)    Financial Condition**

25         Plaintiff asserts that at the time RNET hired her, "RNET represented to [her]

26 that it had $10,000,000 in the bank as a result of its IPO. As it turned out, net of

27 debt and its other expenses, RNET had at least  $8,200,000." (LeBlanc Dec., ¶ 4.)

28

15

1   The Court fails to see how this representation is fraudulent.  One figure

2   ($10 million) was RNET's cash on hand and the other is a partial net worth figure.

3   Plaintiff is comparing "apples to oranges."  As such, she has provided no

4   evidence that any false statement about RNET's financial condition was made to

5   her.  Provenz, 102 F.3d at 1490 (statement of incorrect accounting figure

6   insufficient to show scienter element of securities fraud).

7       **(3)**   **Representation That RNET Had Enough Money to Operate**

8           **Successfully for Term of Agreement**

9       Plaintiff alleges that she was told that RNET could sustain its level of

10  operations for at least the contractual term of Plaintiff's employment and that this

11  statement this was fraudulent "given the more recent statements by RNET about

12  its finances." (LeBlanc Dec., ¶ 4.)  However, wrong predictions are not securities

13  fraud.  See In Re Glenfed, Inc., Secs. Litig., 42 F.3d at 1548-49 (plaintiff does not

14  prove misrepresentation simply by showing that later statements are inconsistent

15  with earlier statement).  Plaintiff does not submit any evidence that the statement

16  was false at the time it was made or that it was made without an honest belief in

17  its truth.  Ultimately,  plaintiff's argument amounts to nothing more than an

18  allegation that RNET failed to sustain its level of operations due to corporate

19  mismanagement.  However, corporate mismanagement is not securities fraud.

20  Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477 (1977).

21

22      **(4)**   **Market Scheme to Manipulate Stock Price**

23      Plaintiff next asserts that defendants were involved in a scheme wherein

24  they would pool their options together and sell them on the market at the same

25  time they registered. (LeBlanc Supp. Dec., ¶¶ 47-50.)  This scheme was allegedly

26  discussed in the July 28, 1998 Board meeting.  Because these discussions

27  occurred after plaintiff's purchase, they are irrelevant to her securities fraud claim.

28  Binder, 184 F.3d at 1066-67 (evidence must show that statement occurred before

16

1    purchase of securities).    Moreover, plaintiff fails to submit any evidence that
2    defendants actually engaged in such a scheme or that this scheme was a fraud in
3    the purchase or sale of any of her securities.

4              **(5)    RNET's Failure To Permit Plaintiff To Exercise Her Options**

5              Finally, plaintiff alleges that RNET committed securities fraud by preventing
6    her from exercising her fully vested options. (LeBlanc Dec., ¶¶ 42-46; LeBlanc
7    Supp. Dec., ¶¶ 57-59; Further Supplemental Declaration of Michele LeBlanc dated
8    March 10, 2000 ("LeBlanc Further Supp. Dec."), ¶¶ 58-59)(defendants refused to
9    accept her attempt to exercise her options).  However, simply preventing plaintiff
10   from purchasing securities, if true, may constitute a breach of contract but does
11   not itself constitute securities fraud. See  Shemtob v. Shearson, Hammill & Co.,
12   448 F.2d 442, 445 (2nd Cir. 1971)(such claim would be a "garden-variety" breach of
13   contract, "which cannot be bootstrapped into an alleged violation of § 10(b)").
14   Again, plaintiff must present evidence that the grant of stock options was made
15   with an intent, at the time of the grant, to refuse any future attempt by plaintiff to
16   exercise the options.   On that point, Plaintiff's only "evidence" is her conclusion
17   that  RNET's refusal to accept her "badly-needed" cash means that RNET never
18   intended to let her purchase securities.  (See OSC Resp., p. 17.)  That RNET may
19   have made a bad business decision is insufficient to show scienter.  Santa Fe
20   Industries, Inc. v. Green, 430 U.S. 462, 477 (1977)(corporate mismanagement is
21   insufficient to show scienter); Provenz, 102 F.3d at 1490 (plaintiff must show
22   "mental state embracing an intent to deceive, manipulate, or defraud" (internal
23   citations omitted)).[10]

24             Accordingly, with respect to plaintiff's Fourth Cause of Action for Securities
25   Fraud, defendants' Motion for Summary Judgment is GRANTED.

26

27   _____

28   [10]Plaintiff also cites to facts that defendants made misstatements to plaintiff's broker. Those
     statements are inadmissible hearsay. In any event, without more, those statements do not
     support a finding of fraud against plaintiff to induce her to purchase or sell securities.

F.   **Gender Discrimination Against RNET (Fifth Cause of Action)**

    1.   **Burden Shifting Analysis**

        Both Title VII and the Equal Pay Act ("EPA") follow the same three-step burden shifting analysis:

> [A] plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (citing Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir. 1985)).

    2.   **There Is No Evidence of Gender Discrimination**

        To establish a prima facie showing of gender discrimination, plaintiff must present evidence (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably. Goodwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998). There is no dispute that plaintiff belongs to a protected class and no evidence that she was not performing adequately.

        Plaintiff alleges that she suffered gender discrimination because RNET denied her benefits granted to male employees such as attendance at one or more management parties, company meetings important to her job function, vacations on terms consistent with the male employees, denial of credit card and expense allowances, and refusal to reimburse her for departmental expenses. (Statement of Genuine Issues, pp. 22-23.)

1    Plaintiff has not provided any admissible evidence that RNET denied her

2    vacations on terms consistent with the male employees, denied her credit card

3    and expense allowances, or refused to reimburse her for departmental expenses.

4    Accordingly, the Court does not consider these allegations. The two types of

5    adverse employment actions on which the Court has received admissible

6    evidence relate to other denied benefits and summary termination.

7    **a.    Denied Benefits**

8    Plaintiff submitted evidence of two denied benefits: (1) exclusion from a

9    party at Mr. Moses's house (LeBlanc Depo. pp. 122-28) and (2) access to a

10   company meeting (LeBlanc Supp. Dec., ¶ 54). However, there is no evidence that

11   plaintiff was denied access to either because of her gender.

12   With respect to Mr. Moses's party, plaintiff fails to provide any evidence

13   that this was an "employment" benefit. Clearly, Mr. Moses can invite anyone he

14   wishes to his social gatherings. Furthermore,  even if this was an employee

15   event, plaintiff's testimony establishes that women as a gender were not

16   excluded. (LeBlanc Depo., p. 127) (Ms. Eddy was invited to Moses's party).

17   The only meeting plaintiff provides evidence of being excluded from is a

18   shareholder meeting that occurred <u>after</u> she was terminated. (LeBlanc Supp Dec.,

19   ¶54.) Because plaintiff was no longer RNET's employee, RNET's conduct cannot

20   be an adverse employment action and therefore does not constitute actionable

21   gender discrimination.[11] Thus, plaintiff has failed to raise a genuine issue of

22   material fact for trial regarding her claim that she was denied employment

23   benefits because of her gender.

24   **b.    Summary Termination**

25

26   _____

27   [11]Plaintiff also alleges that Lori Zaitz was treated favorably because she was having an affair
     with Moses and that Neal was treated favorably because Moses  perceived that he could

28   obtain sexual favors from her.  (OSC. Resp., p. 5.)  There is no evidence either of these
     allegations, and thus the Court does not consider them.

1    Plaintiff also alleges she was discriminated against in her termination

2  because others were terminated on more favorable terms.  (See LeBlanc Dec.,

3  ¶ 34, Moses Depo., p. 21.)  However, the sum of plaintiff's evidence is her

4  testimony that Mr. Megalos also had an employment contract and he was

5  terminated at the end of it.  The Court sees no relevance in the fact that

6  Mr. Megalos's contract was not renewed.[12]

7    There is no evidence that plaintiff was denied benefits or summarily

8  terminated because of her gender.  Accordingly, RNET's motion for summary

9  judgment is GRANTED with respect to the Fifth Cause of Action for Gender

10  Discrimination.

11  **G.    Wage Discrimination Against RNET (Fifth Cause of Action)**

12    Plaintiff alleges that RNET paid her less money than it would have if she

13  was a man in violation of the Equal Pay Act and Title VII.

14    **1.    Equal Pay Act Analysis**

15    Plaintiff's Equal Pay Act claim is argument is based on the pay differential

16  between plaintiff, on the one hand, and three other RNET employees—Wheeler,

17  Lawrence and Parobek[13]—on the other.

18    In order to make out a prima facie case under the Equal Pay Act, 29

19  U.S.C. § 206, plaintiff must show that employees of the opposite sex were paid

20  different wages for equal work.  Stanley v. University of S. Cal., 178 F.3d 1069,

21  1073-74 (9th Cir.), cert. denied, ___ U.S. ___, 120 S. Ct. 533, 145 L.Ed.2d 413

22  (1999) ("Stanley II").  In assessing whether a prima facie case has been made, the

23  

24  [12]Mr. Megalos was not part of the Business & Legal Affairs department that was being phased
     out.  It is undisputed that plaintiff was terminated during the phase out.  Being phased out
25  is not alone evidence of gender discrimination.  In fact, the only attorney that was retained
     was a woman (Neal).
26  

27  [13]In her response to the Court's Order to Show Cause, plaintiff added another male vice
     president, Terry Kehoe.  (OSC Resp., p. 4.)  However, plaintiff provides no evidence of what
28  Mr. Kehoe's duties were.   Her conclusory allegation that they were the same as
     Mr. Parobek's except "as to locale" (LeBlanc Supp. Dec., ¶ 11) is without foundation.

1  Court must determine whether the plaintiff has met her "burden of showing that

2  the jobs being compared are 'substantially equal.'" Id.

3  Courts assess whether jobs are "substantially equal" under a two-step

4  analysis. Id. (citing Brobst v. Columbus Srvs. Int'l, 761 F.2d 148, 156 (3rd Cir.

5  1985)). The first prong of the test requires the plaintiff to present competent

6  evidence to prove that the jobs under comparison share a "'common core' of

7  tasks, i.e., *whether a significant portion of the two jobs is identical*." Stanley, 178

8  F.3d at 1074. (Emphasis added.) The second prong requires the plaintiff to show

9  that there are no tasks incumbent on one job, but not on the other. The presence

10 of such additional tasks renders the jobs "substantially different" under the test.

11 Id.

12 "The prima facie case is limited to a comparison of the jobs in question,

13 and does not involve a comparison of the individuals who hold the jobs." Id. The

14 court focuses not on the job title or description,[14] but rather on whether the jobs

15 require substantially equal skill, effort, responsibility and whether they are

16 performed under similar working conditions. Forsberg v. Pac. Northwest Bell Tel.

17 Co., 840 F.2d 1409, 1414 (9th Cir. 1988); see also Gunther v. County of

18 Washington, 623 F.2d 1303, 1309 (9th Cir.1980), aff'd, 452 U.S. 161, 101 S. Ct.

19 2422, 68 L.Ed.2d 751 (1991).

20 **a.  Plaintiff's Job Was Not Substantially Similar to Wheeler, Lawrence**

21 **or Parobek**

22 The first step in the analysis is to determine whether plaintiff has presented

23 *competent, admissible evidence* to show that she and these three men held

24 positions that involved a common core of tasks—*that is, that a significant*

25 *portion of all of the jobs were identical*. Stanley II, 178 F.3d at 1074. Plaintiff's

26

27 ───────────

28 [14]Thus plaintiff's contentions regarding her comparators' titles (see, e.g. LeBlanc Further Supp. Dec. ¶24), though relevant to her breach of contract claim, is irrelevant to the Equal Pay Act analysis.

21

1    initial response on this issue was wholly inadequate.  Yet, instead of immediately

2    granting summary judgment, the Court issued an Order to Show Cause in which it

3    directed the plaintiff to provide *admissible evidence* of the respective job duties

4    for each position.  In response, plaintiff relies on her own description of what she

5    believes her comparators' job duties were based on certain projects where she

6    provided assistance. This is not sufficient as plaintiff presents no foundation that

7    would make her competent to testify about the overall duties and responsibilities

8    of her comparators.[15]  Accordingly, the Court disregards her testimony to the

9    extent that it goes beyond the duties she personally observed.[16] Bank Melli Iran v.

10   Pahlavi, 58 F.3d 1406, 1412 (9th Cir. 1995) (declarations not based on personal

11   knowledge have no weight).  The Court likewise disregards the many, many

12   instances of hearsay.[17]

13         Finally, the Court disregard's plaintiff's ad hominem attacks on Wheeler,

14   Lawrence and Parobeck.  Such personal attacks are wholly unnecessary because,

15   under the controlling law, the issue of equal pay turns on the content of the job,

16   not the competence of the person performing it.  Stanley II, 178 F. 3d at 1074.

17         Even if the Court were to accept plaintiff's declaration in its entirety, plaintiff

18   has failed to make a prima facie case because the description of the job duties of

19

20

21   ────────────────

22   [15]For example, plaintiff testifies to Wheeler's tenure of employment even though it involved
     periods of time when she was not employed at RNET (LeBlanc Supp. Decl., ¶ 8a.), plaintiff

23   lists job duties without explaining how she knew that the duties were his, or more
     importantly that the list constituted *all of his duties* (Id.).  The declaration is likewise riddled

24   with plaintiff's conclusory assertion that she worked on certain projects as a "peer" or a "co-
     equal."  (E.g., id. at ¶¶ 8a., 8c., 8e.)  That she worked with others on legal aspects of matters

25   in other departments is hardly remarkable since she was an attorney.  There is nothing in the
     Equal Pay Act, however, that suggests that she is therefore entitled to the same pay as those

26   with whom she worked.

27   [16]For example, plaintiff alleges that Wheeler was involved in off-site recreational activities
     while she and others were working at the office.  (Id., ¶ 8b.)

28
     [17]See, for example, plaintiff's Supplemental Declaration at ¶ 8b.

1    plaintiff and her comparators reveals that the jobs in question were not

2    substantially equivalent.

3        **(1)    Plaintiff's Job Duties**

4        As Vice President of Business and Legal Affairs, plaintiff's duties included

5    inspecting financial statements and preparing disclosure documents. (LeBlanc

6    Dec., ¶¶ 3-4.) Among other things, she worked with others in reducing negotiated

7    agreements to written contracts (LeBlanc Supp. Dec., ¶ 8c), in resolving legal

8    issues pertaining to disputes with suppliers (LeBlanc Supp. Dec., ¶ 8f), and in

9    addressing legal issues pertaining to matters such as immigration. (LeBlanc

10    Supp. Dec., ¶ 8d.) Plaintiff had approximately 10 years experience in

11    entertainment law, was formerly the Head of Business Affairs for a European

12    cable network, and had run companies as the President. (LeBlanc Supp. Dec.,

13    ¶ 4.) Her background includes experience in operations, marketing, sales,

14    programming, and production. (LeBlanc Supp. Dec. ¶ 4.) She has an MBA and a

15    JD. (LeBlanc Depo. p. 33.) Plaintiff reported to Mr. Richey, although in the spring

16    of 1998, Moses told her to report to him directly. (LeBlanc Supp. Dec., ¶¶ 6, 9e.)

17    Plaintiff supervised an assistant, an investor/shareholder relations manager, and

18    four legal interns. (LeBlanc Supp. Dec., ¶ 8j.)[18]

19        **(2)    Wheeler's Job Duties**[19]

20    _____

21    [18]Plaintiff's employment contract also lists the following duties for plaintiff: responsible for
     supporting and assisting the CFO and the General Counsel in preparing in-house

22    transactional work; legal research; drafting and revising forms, contracts and other
     documents; and coordinating with other departments. (Neal Dec., Exh. D (plaintiff's

23    employment contract)).

24    [19]In her Further Supplemental Declaration, plaintiff asserts that, by the time she was hired,
     Wheeler's job had been "reduced to operations, including human resources and a new

25    telephone contract[,]" and that she knows that because she was directed to draft a new
     employment contract for Wheeler reflecting this change. (LeBlanc Further Supp. Dec., ¶ 27).

26    To the extent that she is offering evidence of the writing, the testimony is inadmissible under
     the best evidence rule. Fed. R. Evid., Rules 1002-1004. Moreover, this conflict is not material

27    for summary judgment purposes because (1) courts look at duties actually performed, not
     as listed in employment contracts, id., and (2) these duties are still substantially different than

28                                                                                      (continued...)

1    According to the SEC SB2 submitted by plaintiff, Wheeler was a 44-year-old

2    male who was paid an annual salary in excess of $182,000 during the relevant

3    time period. (LeBlanc Supp. Dec., Exh. 34.) He had 22 years of experience in the

4    entertainment and communications industry commencing in 1976 at Cablevision

5    Systems of Long Island. (Id.) He served as Regional Marketing Manager for

6    Showtime Entertainment (1978); Vice President, Vision Cable Communications,

7    Inc. (1979-82); Vice President Marketing, Metro Mobile CTS (1982-87); President

8    of Cellular System Management (1989-94); and president of a cable network from

9    1994-1997. (Id.)[20]

10    The admissible evidence of Wheeler's job duties establishes that his

11    primary duty was to acquire and develop new business by soliciting outside

12    operators to carry RNET's programing. (Declaration of John Wheeler dated

13    March 6, 2000 ("Wheeler Dec."), ¶ 5.) In addition, he was responsible for

14    overseeing the sales and marketing division, including merchandising and

15    distribution; establishing the budget and hiring personnel in the sales and

16    marketing division; negotiating contracts regarding subscription accounts and

17    consulting with the legal department (Richey and plaintiff) regarding those

18    contracts. (Wheeler Dec. ¶¶ 6-9.)[21] Wheeler reported directly to the Chief

19    Executive or Chief Operating Officer. (Wheeler Dec., Exh. A.)

20    _____

21    [19](...continued)
      plaintiff's. Plaintiff's testimony that Wheeler did not "establish contracts with outside cable

22    operators" is based only on hearsay and therefore can be ignored. (LeBlanc Supp. Dec.,
      ¶ 30).

23

24    [20]Even if plaintiff made a prima facie case, Mr. Wheeler's qualifications would indicate a non-
      gender related reason for paying him more than plaintiff. Stanley v. University of S. Cal., 13

25    F.3d 1313, 1322 (9th Cir. 1994)("Employers may reward professional experience and
      education without violating the EPA.")

26    [21]Plaintiff takes issue with this description, asserting Wheeler did not perform these tasks

27    during the time period of her employment at RNET. (LeBlanc Further Supp. Dec. ¶ 23, 27).
      However, as discussed at n.19, supra, even if plaintiff is correct in Wheeler's actual duties,

28    her Equal Pay Act claims with respect to him fail because the actual duties still differ
      substantially from hers.

1          **(3) Lawrence's Job Duties**[22]

2          The admissible evidence of Lawrence's job duties shows that his primary

3    duty was to create and develop programming, a mission statement, and a

4    programming budget, as well as implementing the programming schedule.

5    (Declaration of Mel Lawrence dated March 6, 2000 ("Lawrence Dec."), ¶ 4.) He

6    was also responsible for maintaining and obtaining programing agreements with

7    outside parties, negotiating programing contracts, and video programming.

8    (Lawrence Dec., ¶¶ 5-8.) Lawrence's job required him to travel to RNET's client's

9    locations. (Lawrence Dec., ¶ 6.) Lawrence reported to Moses. (Lawrence Dec.,

10   Exh. A.)

11         **(4)     Parobek's Job Duties**

12         The parties have submitted almost no competent evidence of Parobek's job

13   duties.  There is no declaration of Parobek, his supervisor, or anyone else who

14   would have first hand knowledge of his duties.  However, the contract between

15   Parobek and RNET is before the Court and describes a job whose duties are

16   substantially different from those of Plaintiff.  Plaintiff's testimony regarding Mr.

17   Parobek's duties is insufficient to raise a triable issue of material fact because she

18   has not laid a foundation for anything besides that which she personally

19   observed, (LeBlanc Supp. Dec. ¶10; LeBlanc Further Supp. Dec. ¶¶ 55) and what

20   she personally observed is insufficient to create a genuine issue of material fact

21   for trial as to whether her position and Parobek's shared a common core of tasks.

22   Without evidence of Mr. Parobek's job duties, plaintiff necessarily fails to make a

23   prima facie showing of an EPA violation with respect to his pay.

24         **(5)     No Common Core of Tasks**

25

26   _____

[22]There seems to be a dispute as to whether Mr. Lawrence was an employee or an

27   independent contractor.  This dispute presents a triable issue of fact with respect to the wage
     discrimination claim only if plaintiff would prevail if Lawrence was an employee, but not if

28   he was an independent contractor.  For purposes of this motion, the Court assumes he was
     an employee.

1    The tasks performed by the comparators are not similar to those performed

2    by plaintiff.  Plaintiff's tasks appear to be geared internally toward drafting and

3    reviewing documents, ensuring that departments complied with applicable laws,

4    and assisting in a variety of matters where legal advice was required.  On the

5    other hand, the comparators' jobs were geared externally to developing

6    programming (Lawrence) and dealing with outside parties to promote RNET's

7    sales (Wheeler).[23]  Plaintiff implies that she did her comparators's job along with

8    each of them.  If, in fact, she is adding value to the process, this would tend to

9    show that her job was different than her comparators.  Indeed, she has done

10   nothing more than describe the traditional role of an in-house attorney—give

11   advice and assistance to those responsible for managing the operation of the

12   business.  This is not evidence that the jobs in question shared a common core of

13   tasks.[24]

14       **b.    The Comparators' Jobs Entailed Additional Tasks or**

15           **Responsibilities**

16       Even if the tasks performed were similar, each job entailed additional tasks

17   or responsibilities that made them different.  For example, Wheeler was

18   authorized to sign checks (LeBlanc Supp. Dec. ¶ 8f.)  Mr. Lawrence was required

19   to travel.  (Lawrence Dec., ¶ 6.)

20       Plaintiff has failed to make a prima facie showing that she did the same or

21   substantially similar work as her comparators.  Accordingly, with respect to

22   plaintiff's cause of action for violation of the Equal Pay Act, defendants' Motion for

23   Summary Judgment is GRANTED.

24   _____

25   [23]This difference is perhaps best summarized by plaintiff's own testimony that, for example,
     Wheeler would negotiate contracts and she would draft them based on the information he
26   provided her.  (LeBlanc Supp Dec., ¶ 8c.)

27   [24]Plaintiff attempts to show that she was also responsible for outside sales and travel
     because she went to a trade show in New Orleans.  However, the record indicates that
28   plaintiff was sent because of her contacts in New Orleans (where she used to live), and not
     as a function of her job.  See LeBlanc Further Supp. Dec., ¶ 10.

1          **2.**     **Title VII Analysis**

2            Running concurrently with (and beyond) the Equal Pay Act, Title VII also

3 protects against intentional wage discrimination because of sex. <u>County of</u>

4 <u>Washington County v. Gunther</u>, 452 U.S. 161 (1981). In her opposition to

5 defendants' motion for summary judgment, plaintiff alleged that RNET engaged in

6 wage discrimination under Title VII because "RNET compensated Parobek with

7 greater benefits, such as options. That was not only a violation of plaintiff's

8 contract, but also is wage discrimination." (Opp. at 20.) Plaintiff claims that she

9 and Parobek did equal work. To the extent plaintiff alleges that she has been

10 denied equal pay for equal work under Title VII, the same Equal Pay Act analysis

11 discussed above applies. <u>Foster v. Arcata Associates</u>, 772 F.2d 1453, 1462 (9th

12 Cir. 1985), <u>cert. denied</u>, 475 U.S. 1048 (1986), <u>overruled on other grounds by</u>

13 <u>Kennedy v. Allied Mutual Ins. Co.</u>, 952 F.2d 262 (9th Cir. 1991) (Equal Pay Act

14 analysis applies where Title VII claimant contends she has been denied equal pay

15 for substantially equal work).

16            However, as plaintiff correctly points out, a Title VII cause of action will lie

17 where a plaintiff establishes that she would have earned more had she been a

18 man. <u>Gunter</u>, 452 U.S. at 178-79. Thus, in response to the Court's Order to Show

19 Cause, plaintiff appears to have changed her Title VII claim to a comparative

20 worth theory: "RNET provided higher salaries and benefits to male executives

21 with similar or lower job duties than were assigned to Plaintiff. Female executives

22 at Plaintiff's level received uniformly lower salaries." ( OSC Response, p. 5.) The

23 Court thus applies a Title VII analysis; that is, it must determine whether plaintiff

24 has shown disparate treatment or disparate impact. <u>Atonio v. Wards Cove</u>

25 <u>Packaging Co., Inc.</u>, 810 F.2d 1477, 1480 (9th Cir. 1987); <u>see</u> <u>Gunther</u>, 452 U.S. at

26 178-79.

27          **a.**     **Disparate Treatment**

28

1    To establish a prima facie case of disparate treatment, plaintiff must show

2    that RNET intentionally treated people differently <u>because of</u> their gender.

3    <u>Antonio</u>, 810 F.2d at 1480. A discriminatory motive can be inferred by a sufficient

4    showing of disparity between the class members and the comparably qualified

5    members of the majority group. <u>Id.</u>

6    In alleging discriminatory motive, plaintiff relies on the same conclusory

7    allegation as she did for her gender discrimination claim: that women received

8    fewer benefits than men. As discussed above, Part III.F.2, <u>supra</u>, plaintiff failed to

9    provide any admissible evidence regarding the kind of benefits male executives

10   received versus what female executives received, and thus fails to make a prima

11   facie showing of disparate treatment.

12        **b.    Disparate Impact**

13   To show disparate impact, plaintiff must show that "a specific, clearly

14   delineated employment practice" was biased against women. <u>Am. Fed'n of State,</u>

15   <u>Count, and Municipal Employees v. Washington</u>, 770 F.2d 1401, 1404 (9th Cir.

16   1985). Here, plaintiff points to no specific employment practice of RNET that was

17   discriminatory.

18   Plaintiff is thus unable to show any evidence that would support her gender

19   or wage discrimination claims. Accordingly, with respect to plaintiff's Fifth Cause

20   of Action for Gender and Wage Discrimination, defendants' Motion for Summary

21   Judgment is GRANTED.

22   **H.    Religious Discrimination Against RNET (Sixth Cause of Action)**

23   Plaintiff's religious discrimination claim is based on her allegation that she

24   was branded a "voodoo witch" or "voodoo queen," which made other employees

25   avoid her, and that RNET knew about the situation and did nothing about it.

26   To make a prima facie case of religious discrimination, plaintiff must

27   show: "(1) she had a bona fide religious belief, the practice of which conflicted

28   with an employment duty; (2) she informed her employer of the belief and

28

1    conflict; and (3) the employer threatened her or subjected her to discriminatory

2    treatment, including discharge, because of her inability to fulfill the job

3    requirements." Tiano v. Dillard Dep't Stores, Inc., 139 F. 3d 679, 681 (9th Cir.

4    1988).

5         Plaintiff admits that she is Catholic and that she does not believe in voodoo

6    or engage in any voodoo practices. Plaintiff's sole basis for claiming religious

7    discrimination is that she was associated with voodooism. Because plaintiff has

8    no evidence that RNET subjected her to discriminatory treatment because of her

9    bona fide religious belief, or that any of her religious beliefs conflicted with an

10   employment duty, she has failed to make out a religious discrimination cause of

11   action.

12        Accordingly, with respect to plaintiff's Sixth Cause of Action for Religious

13   Discrimination, defendants' Motion for Summary Judgment is GRANTED.

14   **I.    Sexual Harassment Against All Defendants (Seventh Cause of Action)**

15        **1.    Claims Against Individual Defendants**

16        As an initial matter, plaintiff alleges sexual and religious harassment and

17   retaliation against Moses, Horowitz, Wheeler and Lawrence, individually. Because

18   individuals cannot be held liable for damages under Title VII, Miller v. Maxwell

19   Internat'l, Inc., 991 F.2d 583 (9th Cir. 1993), cert. denied 510 U.S. 1109 (1994),

20   defendants Moses, Horowitz, Wheeler and Lawrence's Motion for Summary

21   Judgment with respect to the Title VII claims for sexual harassment, religious

22   harassment and retaliation is GRANTED.

23        Under California's Fair Housing and Employment Act ("FEHA"), non-

24   supervisory co-workers also cannot be personally liable  for harassment.

25   Carrisales v. Dep't of Corrections, 21 Cal. 4th 1132, 90 Cal. Rptr. 2d 804 (1999).

26   Accordingly, defendants Wheeler and Lawrence's Motion for Summary Judgment

27   with respect to the FEHA claims for sexual and religious harassment is GRANTED.

28

1      On the other hand, under FEHA a supervisor may be personally liable for

2  harassment and retaliation. See Liberto-Black v. City of Arroyo Grande, 33 F.

3  Supp.2d 1241 (C.D. Cal. 1999); Page v. Superior Court, 31 Cal. App. 4th 1206, 37

4  Cal. Rptr. 2d 529 (1995).  Accordingly, the analysis below considers plaintiff's

5  harassment claims against Moses and Horowitz.

6      **2.    Evidence of Hostile Work Environment**

7      Plaintiff's sexual harassment claim is based on hostile environment

8  harassment and not quid pro quo.[25]  In order show a hostile environment, plaintiff

9  must show (1) she was subjected to sexual advances, requests for sexual favors,

10  or other verbal or physical sexual abuse; (2) the conduct was unwelcomed; and

11  (3) that the conduct was sufficiently severe or pervasive to alter the conditions of

12  her environment and create an abusive working environment. Ellison v. Brady,

13  924 F.2d 872, 875-76 (9th Cir. 1991).

14      A "hostile environment" is one that is both objectively[26] and

15  subjectively offensive. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

16  To be actionable, the harassment must be severe or pervasive--the "'mere

17  utterance of an . . . epithet which engenders offensive feelings in an employee'" is

18  not sufficient to show violation of Title VII. Meritor Savings Bank, FSB v. Vinson,

19  477 U.S. 57, 67 (1986)(quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

20  Thus, the Court looks to the totality of the circumstances, including the frequency

21  and severity of the conduct; whether it is physically threatening or humiliating, or

22  merely offensive; and whether it unreasonably interferes with an employee's work

23  performance. Faragher, 524 U.S. at 787-88.  Plaintiff basis her sexual harassment

---

[25]Plaintiff offers no evidence that she was promised benefits if she gave, or was threatened
if she denied, a sexual favor.

[26]Objectivity is measured by a "reasonable woman" standard.  Ellison, 924 F.2d at 879.

1    claim on (1) discussions about the Moses-Zaitz affair and (2) Moses' conduct

2    towards her.[27]

3        **(a)**    **Discussions About The Moses-Zaitz Affair**

4        Plaintiff was involved in several discussions about the affair between Bill

5    Moses and Lori Zaitz.  She cannot remember specifics of most of the discussions

6    because the affair "was common knowledge and generally discussed in the

7    office." (LeBlanc Depo., p. 207.)  During one conversation with Wheeler, Wheeler

8    stated that Zaitz had a "golden pussy" and "golden balls" and that she could do

9    whatever she wanted. (LeBlanc Depo., p. 226.)[28]  There was another conversation

10   with Wheeler and another man where the men laughed about the affair. (LeBlanc

11   Depo., p. 227.)  Finally, in a conversation with Richey, Wheeler and Horowitz, the

12   men made jokes to the effect that if President Clinton could have an affair, so

13   could the president of RNET. (LeBlanc Depo., pp. 207, 228.)[29]

14       **(b)**    **Conduct By Moses To Plaintiff**

15       On at least two occasions in the summer of 1998, Moses put his arm

16   around plaintiff "in a sexual way which was unwanted" and said "Hey, Babe."

17   (LeBlanc Depo., pp. 65-66, 68.)  Plaintiff told Moses to stop. (LeBlanc Depo.

18   

---

19   [27]Plaintiff also makes an allegation that, when plaintiff first hired Tracy Neal on a temporary
20   basis, Moses told plaintiff to "get rid of that black bitch because she's double trouble.  If you
     hire her and fire her she's double trouble." (LeBlanc Depo., p. 89-90) (apparently meaning
21   that it would be difficult to fire her because she is a member of two protected categories).
     However, plaintiff cannot create a material issue of fact by contradicting other testimony,
22   such as here where she has declared that when Moses first saw Neal in July 1998, "he
     insisted I hire [her]." (LeBlanc Dec., ¶ 13.)
23   

24   [28]The cited deposition testimony references earlier testimony to that effect, although that
     testimony is not attached.

25   [29]Plaintiff does not recall any other conversations with Horowitz. (LeBlanc Depo. p. 230.)
26   Plaintiff's only other allegation against Horowitz is that he told "a very inappropriate lewd
     story [about] President Kennedy." (LeBlanc Supp. Dec., ¶ 26; LeBlanc Depo. pp. 190-91.)
27   This evidence was not in the Statement of Genuine Issues and thus should not be
     considered.  Even if it were considered, the sexual harassment laws are not designed to
28   protect against such off-color jokes. Faragher, 524 U.S. at 788.  Accordingly, as to plaintiff's
     claim against Horowitz individually, his Motion for Summary Judgment is GRANTED.

pp. 76, 81-85.)  On the second occasion, Moses also made comments that Tracy

Neal was attractive, inquiring whether she (Neal) was single and then making lewd

and obscene gestures (licking his lips and making overt sexual gestures with his

tongue). (LeBlanc Depo., p. 84.)  Plaintiff reported both incidents to Richey, who

responded essentially "That's Bill." (LeBlanc Depo., pp. 76, 83.)

### 3. There Is Sufficient Evidence to Raise a Triable Issue of Fact as to the Environment at RNET

### (1) Discussions About The Office Affair Does Not Create A Hostile Work Environment.

Conversations regarding the Moses-Zaitz affair, by itself, is not sufficient to

create a hostile work environment because Title VII is not intended to be a

"general civility code." Faragher, 524 U.S. at 788.

> Properly applied, [the Title VII standards] will filter out complaints
> attacking the ordinary tribulations of the workplace, such as the
> sporadic use of abusive language, gender-related jokes, and
> occasional teasing.

Id. (internal quotations omitted).  The evidence in the record shows that the

conversations about the affair were nothing more than "water cooler" gossip

about an inter-office romance.

Plaintiff alleges that the affair was flaunted so that she would know that, if

she was sexually available to Moses, should would fare well at the company.

Though Zaitz may have gotten favorable treatment as Moses' paramour, there is

no evidence that plaintiff was informed that she too could get such treatment if

only she would have an affair with Moses.  Rather, the conversations were

nothing more than gossip that, even when coupled with jokes regarding a highly

publicized sexual scandal by the President of the United States, falls into the

category of "ordinary tribulations" not covered by Title VII. Id.

1        (2)     **Conduct By Moses Alone Was Not Sufficiently Severe To**
2                **Constitute Harassment**

3        While the Court is troubled by Moses's overtures, his conduct alone did not

4    create the type of pervasive hostile environment envisioned by Title VII. To be

5    actionable, "conduct must be extreme to amount to a change in the terms and

6    conditions of employment[.]" Id.

7        What plaintiff has described here is two to three isolated instances of

8    questionable conduct over 1½ years. See Ellison, 924 F.2d at 878 (inverse

9    relationship between severity of conduct and pervasiveness). She does not allege

10   that she found the conduct to be threatening or humiliating, or that her work

11   suffered because of it. See Faragher, 524 U.S. at 787-88. While the Court does

12   not condone such behavior, the conduct alone does not rise to the level of a Title

13   VII violation.[30]

14       (3)     **Looking at the Totality of The Circumstances, There Is A Triable**
15               **Issue of Fact Whether There Was A Hostile Work Environment**

16       While individual incidents alone may not create a Title VII violation,

17   determination of whether an environment is hostile requires consideration of the

18   totality of the circumstances. Faragher, 524 U.S. at 787-88. "It would not be right

19   to require a judgment against [plaintiff] if the sum of all of the harassment [she]

20   experience was abusive, but the incidents could be separated into several

21   categories, with no one category containing enough incidents to amount to

22   'pervasive' harassment." Hafford v. Seidner, 183 F.3d 506, 515 (9th Cir. 1999). So

23   here. While the individual incidents complained of by defendants do not by

24   themselves create a hostile work environment, there is a triable issue of fact as to

25   whether the totality of them did create such an environment. Accordingly,

26

27   _____

28   [30]Accordingly, as to plaintiff's claim against Moses individually, his Motion for Summary
     Judgment is GRANTED.

                                          33

1    RNET's motion for summary judgment on plaintiff's Seventh Cause of Action for

2    Sexual Harassment is DENIED.

3    **J.    Religious Harassment Against RNET, Moses, and Horowitz (Seventh**

4    **Cause of Action)**

5            Although Plaintiff is Catholic and has never engaged in voodoo, she alleges

6    that there was a harassing campaign to brand her a "voodoo witch" or "voodoo

7    queen." She states that the campaign began after she returned from a convention

8    in New Orleans with Mr. Lawrence and Ms. Zaitz. She explains that during the

9    convention, "both Ms. Zaitz and Mr. Lawrence insisted that I introduce them to a

10   voodoo priestess, who I know in New Orleans. They insisted that their

11   photographs be taken with the priestess and her python, and brought numerous

12   potions from her." (LeBlanc Decl. ¶ 19(a).)[31]

13           After the trip, "Mr. Wheeler confronted [plaintiff] with claims that [she] was

14   a 'voodoo witch' or a 'voodoo queen,' and informed [her] that he would begin a

15   'Smith & Wesson' clause (referring to the gun) in all employee contracts by which

16   he could eliminate those whose religions he disliked." (LeBlanc Dec., ¶ 19d.) In

17   addition, there were at least two instances where she heard Mr. Moses referred to

18   her as a "voodoo witch" or a "voodoo queen," once in one-to-one conversation

19   and once in small group of senior management. (LeBlanc Depo, pp. 102, 107.)

20           Plaintiff's religious harassment suffers from the same problem as her

21   religious discrimination claim--she does not allege that she was harassed because

22   of any of her bona fide religious beliefs. The voodoo name calling appears to be

23   no more than an office joke that surfaced after plaintiff offered to introduce people

24   to a voodoo witch she knew in New Orleans. Plaintiff played along with the joke

25

26   _____

27   [31]Plaintiff also makes other allegations that are not admissible. For example, she contends
     that "[a]t least one person outside of the company, Phil Diaz, was told of this campaign. Mr.
     Diaz informed me that he was shocked that Messrs Moses, Masters, Wheeler, and perhaps

28   others were laughing about me and calling me a voodoo witch." (LeBlanc Decl. ¶ 19(b).)
     This is patently hearsay.

1   by affixing a voodoo doll to the <u>outside</u> of her office door.  (UF 29.)  There is no

2   evidence of religious harassment.

3          Accordingly, with respect to plaintiff's Seventh Cause of Action for Sexual

4   and Religious Harassment, defendants' Motion for Summary Judgment is

5   GRANTED.

6   **K.     Retaliation Against All Defendants (Eighth Cause of Action)**

7          Plaintiff's Eight Cause of action alleges that, although her job was being

8   phased out, she was discharged summarily in retaliation for complaints she made

9   about sexual harassment and unequal pay when she heard about the phase out.[32]

10  To make a prima facie case of for retaliatory discharge under Title VII, plaintiff

11  must show (1) she engaged in a protected activity; (2) she was thereafter subject

12  to an adverse employment action; and (3) a causal link exists between the

13  two.  <u>Wallis v. Simplot Co.</u>, 26 F.3d 885, 891 (9th Cir. 1994).

14         It is undisputed that Horowitz alone made the decision to terminate plaintiff

15  as part of the phasing out of the Business & Legal Affairs department.  (UF 10-14.)

16  Plaintiff admits that, when Horowitz told her that her department was going to be

17  eliminated, he told her that she would be let go in three months.  (LeBlanc Supp.

18  Dec., ¶ 29.)  Recognizing this, plaintiff does not allege that the termination itself

19  was retaliatory; rather, she asserts that the timing was.  That is, plaintiff asserts

20  that once she indicated that she wanted her buyout agreement to cover her

21  potential harassment and discrimination claims, RNET terminated her with one

22  day notice, rather than "phasing" her out.  (OSC Reply, pp. 3-4.)

23         Even assuming that plaintiff engaged in protected conduct, plaintiff fails to

24  show that she suffered an adverse employment action because of her protected

25  conduct.  Under her contract, plaintiff could be terminated upon either 30 or 90

26  days notice, depending on whether the termination was with or without cause.

27

28  [32]Plaintiff concedes that the decision to "phase out" her job was <u>not</u> retaliatory.  <u>See</u> Reply to Defendants' Response to OSC, p. 3-4.

35

1   Plaintiff was given that notice.  Further, although plaintiff was ultimately

2   terminated with only one day notice, she was paid as if she had been given 90

3   days notice; i.e. she received $40,000 in severance.  Thus, plaintiff was in no

4   worse position than if she was "phased out."  To the contrary, plaintiff received

5   the benefit of 3 months salary without actually having to work.

6          Because plaintiff cannot make a prima facie showing of retaliation,

7   defendants' Motion for Summary Judgment is GRANTED with respect to plaintiff's

8   Eighth Cause of Action for Retaliation.

9   **L.    Wrongful Termination in Violation of Public Policy Against RNET (Ninth**

10         **Cause of Action)**

11         The tort of wrongful termination in violation of public policy prevents

12  termination based on violations of important public policies that arise from

13  constitutional provisions, statutes or regulations.  Green v. Ralee Engineering Co.,

14  19 Cal. 4th 66, 79, 78 Cal. Rptr. 2d 16, 24 (1998).  In order to prevail on this cause of

15  action, plaintiff must show a nexus between her protected activities and the

16  decision to terminate her. See Turner v. Anheuser-Busch, 7 Cal. 4th 1238, 1253, 32

17  Cal. Rptr. 223, 232 (1994).  Plaintiff has the duty to specify which public polices

18  she alleges were violated in her termination.  Turner, 7 Cal. 4th at 1257, 32 Cal.

19  Rptr. 2d at 235 (by summary judgment stage, defendant should not have to guess

20  what public policies were alleged to have been violated).

21         While plaintiff has not alleged specific statutory authority, her complaint

22  alleges that RNET was motivated to terminate her employment because she

23  (1) protested sexual harassment; (2) protested inequitable pay to women;

24  (3) protested the "sexually-charged atmosphere" in the office; (4) protested

25  "voodoo" comments; (5) protested alleged attempts to cheat RNET's outside

26  contractors; (6) protested RNET's alleged attempt to falsify information in an SB2

27  filing; and (7) protested RNET's alleged use of a shell corporation to avoid payroll

28  taxes.  (FAC, ¶ 95.)

1    However, plaintiff's own testimony shows that RNET did not consider any
2    of these in deciding to terminate her.  As discussed above, Horowitz alone made
3    the decision to terminate plaintiff's employment as part of his plan to cut RNET's
4    expenses by eliminating the legal department.  (UF 10-14.)  Thus, it is undisputed
5    that the initial determination to terminate plaintiff's employment was not based on
6    any of plaintiff's protected activities.

7    Plaintiff's implication that the wrongful termination occurred at the time
8    RNET decided not to retain her as a liaison is likewise without merit.  Plaintiff
9    admits that being a liaison would only have extended her employment by three
10   months, it was not a promise of continued employment.  (See LeBlanc Supp.
11   Dec., ¶ 29)(when Horowitz told plaintiff he was eliminating the legal department,
12   "[h]e said that he wanted [plaintiff] to stay on for three months to be the liaison to
13   the law firm . . . ") (emphasis added).  Moreover, the evidence shows that
14   Horowitz knew about plaintiff's complaints of sexual harassment and gender
15   discrimination before his initial decision to keep plaintiff as a liaison.  (See LeBlanc
16   Dec., ¶ 20(d))(plaintiff complained about sexual harassment when Horowitz was
17   hired as president) and plaintiff's complaints about the third-party contracts were
18   made to Moses, not Horowitz.  (See LeBlanc Dec., ¶ 20(g).)

19   As for the remaining bases for this claim, there is no evidence that Horowitz
20   changed his mind that day because he suddenly became aware of plaintiff's
21   activities.  Indeed, plaintiff asserts that the conversation in which she was told that
22   she would be retained as a liaison occurred on August 20, 1998--the day she was
23   terminated.  (LeBlanc Supp. Dec., ¶ 29.)  Nowhere does  plaintiff show that she
24   made the above-mentioned complaints to Horowitz between the time that he told
25   her she would be retained as a liaison and the time he summarily terminated her.

26   Accordingly, plaintiff's Ninth Cause of Action for Wrongful Termination in
27   Violation of Public Policy is DENIED.

28

37

M.     **Intentional Infliction of Emotional Distress Against All Defendants (Tenth Cause of Action)**

The elements of intentional infliction of emotional distress are: (1) outrageous conduct; (2) intention to cause emotional distress or reckless disregard of the probability of causing such distress; (3) severe emotional suffering; and (4) proximate causation of emotional distress. Fisher v. San Pedro Peninsula Hosp., 214 Cal. App. 3d 590, 617, 262 Cal. Rptr. 842, 857 (1989). Defendants assert that they are entitled to summary judgment because this cause of action is preempted by workers compensation and their conduct was not outrageous as a matter of law.

1.     **Plaintiff's Claim Is Not Pre-Empted by Workers' Compensation**

Generally, a claim for intentional infliction of emotional distress arising out of an employment dispute is preempted by workers compensation. See, e.g., Cole v. Fair Oaks Fire Protect'n Dist., 43 Cal. 3d 148, 233 Cal. Rptr. 308 (1994). However, where an employer's conduct is "beyond the boundaries of the compensation bargain," or the employer "steps out of its proper role," an employee may bring a separate action.  Cole, 43 Cal. 3d at 160; Shoemaker v. Meyers, 52 Cal. 3d 1, 276 Cal. Rptr. 303 (1990).  Thus, if the employer's conduct violates public policy, a separate cause of action is proper. Gantt v. Sentry Indus., 1 Cal. 4th 1083, 1085, 4 Cal. Rptr. 2d 874 (1992), overruled on other grounds Green v. Ralee Engineering Co., 19 Cal. 4th 66, 79, 78 Cal. Rptr. 2d 16, 24 (1998).  Here, plaintiff's allegation of intentional infliction of emotional distress is based in part on her claim of sexual harassment. (FAC, ¶ 96.)  Because a harassing environment is not part of the "compensation bargain," plaintiff's intentional infliction of emotional distress claim is not preempted by workers' compensation. See Accardi v. Superior Court, 17 Cal. App. 4th 351, 352, 21 Cal. Rptr. 2d 292 (1993).

2.   **Outrageous Conduct**

Outrageous conduct is that which exceeds all bounds usually tolerated by a decent society. <u>Fisher</u>, 214 Cal. App. 4th at 617, 262 Cal. Rptr. at 857.  By its very nature, sexual harassment in the workplace meets that definition.  <u>Id.</u> at 617-18. Because there is a triable of issue of fact regarding plaintiff's sexual harassment claim, the Court cannot say that defendants conduct was not "outrageous" as a matter of law.  Accordingly, as to plaintiff's Tenth Cause if Action for Intentional Infliction of Emotional Distress, defendants' motion for summary judgment is DENIED.

### IV.

### CONCLUSION

For the reasons set forth above, defendant's Motion for Summary Judgment is GRANTED with respect to plaintiff's Third, Fourth Fifth, Sixth, Seventh (with respect to Religious Harassment only), Eighth and Ninth Causes of Action.  In addition, defendant's Motion for Summary Judgment is GRANTED with respect to plaintiff's Seventh Cause of Action against the individual defendants.

Defendant's Motion for Summary Judgment is DENIED with respect to plaintiff's First, Second (except insofar as this claim is based on RNET's failure to give plaintiff more than one day's notice of termination), SEVENTH (with respect plaintiff's claim of sexual harassment against RNET), and TENTH Causes of Action.

Attached hereto is a new Schedule and Case Management Order which contains the revised pre-trial and trial schedule in this case.

IT IS SO ORDERED.

DATED: May 2, 2000

Judge Gary Allen Feess
United States District Court

39